**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

_____

|                               |   |                        |
|-------------------------------|---|------------------------|
|                               | ) |                        |
| WALLEON BOBO,                 | ) |                        |
|                               | ) |                        |
|     Plaintiff,                | ) |                        |
|                               | ) |                        |
| v.                            | ) | No. 08-cv-2238 JPM-cgc |
|                               | ) |                        |
| UNITED PARCEL SERVICE, INC.,  | ) |                        |
|                               | ) |                        |
|     Defendant.                | ) |                        |
|                               | ) |                        |

_____

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

Before the Court is Defendant United Parcel Service, Inc.'s ("Defendant" or "UPS") Motion for Summary Judgment (Docket Entry ("D.E.") 46), filed May 29, 2009. Plaintiff filed a response (D.E. 52) in opposition to Defendant's Motion on June 26, 2009. With leave of Court, Defendant filed a reply brief (D.E. 60) on July 22, 2009. The Court held a telephonic hearing on the Motion on July 23, 2009. Counsel representing Plaintiff at the hearing was Luther Oneal Sutter, Esq.; counsel representing Defendant were Stanley Graham, Esq., and William Fiala, Esq. The Court heard further arguments on the Motion on August 17, 2009. Counsel for Plaintiff were Andrew Clarke, Esq. and Luther Oneal Sutter, Esq.; counsel for Defendant were Stanley

Graham, Esq. and William Fiala, Esq.  For the following

reasons, Defendant's Motion is GRANTED.

## I. BACKGROUND

This case arises out of Plaintiff's employment with

Defendant.  At all relevant times, Plaintiff, who is

African-American, was employed by UPS as an On-Road Feeder

Supervisor at UPS's Oakhaven Center in Memphis, Tennessee.

(Pl.'s Resp. to Def.'s Statements of Undisputed Facts (D.E.

56) ¶ 1.)  As an On-Road Feeder Supervisor, one of

Plaintiff's job responsibilities was to conduct what is

known as Space and Visibility training for the Feeder

Drivers. (Def.'s Mot. for Summ. J. Ex. 2, Dep. of Walleon

Bobo ("Bobo Dep.") 18:2-6.)  Plaintiff was responsible for

conducting annual Space and Visibility training with every

driver under his supervision, plus similar training after

the occurrence of an accident.  (Def.'s Mot. for Summ. J.

Ex. 16, Decl. of Bob Wagner ("Wagner Dep.") ¶ 3.)

UPS policy requires Feeder Supervisors to fill out a

so-called Record of Safety Ride, documenting the driver's

safety performance during Space and Visibility training.

(Id. ¶ 5.)  Normally, Space and Visibility training rides

take at least half a work day to complete.  (Id. ¶ 4.)

Under UPS policy, drivers being evaluated are asked to sign

the completed Record of Safety Ride, confirming that the

ride was done and that the driver understood the instruction given.  (Id. ¶ 5.)

On April 18, 2007, Fredrick Flenorl, a UPS Feeder Driver who is also African-American, made a telephone complaint to UPS Security, alleging that Plaintiff had falsified Flenorl's safety records. (Bobo Dep. 21:18-22:5; Wagner Decl. ¶ 9.)  Mr. Flenorl reported that Plaintiff instructed him to "sign a blank form regarding [his] annual safety ride."  (Bobo Dep. 22:1-23:17.)  UPS Security Supervisor Orlando Croft and UPS Security Investigator Ronald Barrett, both of whom are African-American, investigated Flenorl's complaint.  (Bobo Dep. 33:14-22; Wagner Decl. ¶ 10.)

During the investigation, Plaintiff admitted that he had not performed a full Space and Visibility Ride with Mr. Flenorl and that Flenorl signed the form before it was complete.  (Bobo Dep. 34:7-13, 35:20-36:4.)  Plaintiff asserts that he was instructed to falsify the length of his demonstration time on the form because the UPS Oakhaven Center "frequently failed its national feeder audit due to insufficient documentation of safety rides, including demonstration time." (Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. G, Aff. of Walleen Bobo ("Bobo Aff.") ¶ 7.)

Based on evidence obtained during his investigation, Mr. Barrett believed Plaintiff had engaged in acts of dishonesty and falsification of safety records. (Wagner Decl. ¶ 11.) As a result, Mr. Barrett recommended that Plaintiff be placed out of service pending further investigation. (<u>Id.</u>; Bobo Dep. 36:5-16.)

After investigating further, UPS obtained additional evidence suggesting that Plaintiff had on other occasions falsified Record of Safety Ride forms involving feeder drivers whom he supervised. (Bobo Dep. 32:1-33:2; Wagner Decl. ¶ 12.) As a result, UPS determined that Plaintiff should be terminated.

UPS Security interviewed numerous employees in its investigation into alleged falsification. Only Plaintiff admitted to falsifying the safety records. (Wagner Decl. ¶¶ 14, 30.) In October 2007, five months after Plaintiff was discharged, UPS Security received a report alleging that Ronnie Wallace, who is Caucasian, had also falsified records. (Wagner Decl. ¶ 20.) UPS Security responded by conducting an investigation and interviewing Mr. Wallace. (<u>Id.</u>) During the interview, Mr. Wallace admitted to falsifying safety records. (<u>Id.</u>) After being told that he would be discharged, Mr. Wallace chose to resign. (<u>Id.</u>)

Plaintiff has been a member of the military since being hired by UPS in 1987.  (Bobo Dep. 55:12-56:1.)  In June and July 2006, Plaintiff went on military leave in order to perform a Military Service Obligation ("MSO"). (Wagner Decl. ¶¶ 22-23.)  During this time, UPS mistakenly paid Plaintiff his regular salary while he was receiving military pay.  (Id. ¶ 23.)  UPS discovered the overpayments to Plaintiff in August 2006 and began payroll deductions for several months.  (Id. ¶ 24.)  UPS provided Plaintiff with its calculations and an explanation of the deductions.

On April 17, 2008, Plaintiff filed this action, alleging (a) race discrimination under Title VII of the Civil Rights Act of 1963, and the Tennessee Human Rights Act ("THRA"); and (b) discrimination and retaliation under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").

**II. STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322

(1986).  So long as the movant has met its initial burden of "demonstrat[ing] the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, and the nonmoving party is unable to make such a showing, summary judgment is appropriate.  Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989).  In considering a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion."  Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When confronted with a properly-supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); see also Abeita v. TransAmerica Mailings, Inc., 159 F.3d 246, 250 (6th Cir. 1998).  A genuine issue of material fact exists for trial "if the evidence [presented by the nonmoving party] is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." Anderson, 477 U.S.
at 251-52.

### III. ANALYSIS

In the instant Motion, Defendant argues (a) that
Plaintiff cannot establish a prima facie case for race
discrimination under Title VII and the THRA; and (b) that
its decision to terminate Plaintiff was not based on
Plaintiff's military service and therefore did not violate
USERRA.

#### A. Title VII Claims

##### 1. Race Discrimination

Title VII makes it unlawful for an employer to
"discriminate against any individual with respect to his
compensation, terms, conditions, or privileges of
employment because of such individual's race, color,
religion, sex, or national origin."  42 U.S.C. § 2000e-
2(a)(1).  Plaintiff may establish a prima facie case of
race discrimination under Title VII through direct
evidence, or through circumstantial evidence under the
McDonnell Douglas burden-shifting framework.  See Kline v.
Tenn. Valley Auth., 128 F.3d 337, 348 (6th Cir. 1997),
*reh'g and reh'g en banc denied*; see also McDonnell Douglas
Corp. v. Green, 411 U.S. 792, 803 (1973).  Because the
Plaintiff has put forth only indirect evidence to support

his claim of discrimination, the Court will analyze his claim under McDonnell Douglas.

Under McDonnell Douglas, a plaintiff must first make out a prima facie case of discrimination by showing that (1) he is a member of a protected group; (2) he was subject to an adverse employment action; (3) he was qualified for the position; and (4) similarly-situated non-protected employees were treated more favorably.  Kline, 128 F.3d at 348 (applying the burden-shifting method to gender and racial discrimination cases); see also McDonnell Douglas, 411 U.S. at 803.

Although Defendant does not explicitly concede that Plaintiff has met his burden as to the first three elements of his race discrimination claim under Title VII, UPS only addresses the fourth element of Plaintiff's prima facie case.  As a result, the Court concludes that only the fourth element – whether similarly-situated non-protected employees were treated more favorably than Plaintiff – is in dispute.

At the prima facie stage, a plaintiff can meet the "similarly situated" requirement by showing that he is similarly situated to a non-protected employee "in all relevant aspects."  Barry v. Noble Metal Processing, Inc., 276 F. App'x 477, 480 (6th Cir. 2008) (quoting Ercegovich

v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)); see also Gibson v. Shelly Co., 314 F. App'x 760, 771 (6th Cir. 2008) ("[P]laintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment."). While courts are to make an independent determination of which factors are relevant in a particular case, courts in this circuit have used the factors set forth in Mitchell v. Toledo Hospital, 964 F.2d 577 (6th Cir. 1992), as a guideline when making this determination. See Gibson, 314, F. App'x at 771; see also Barry, 276 F. App'x at 480-81. These factors include whether the plaintiff and the non-protected employee (1) share the same supervisor; (2) are subject to the same standards; and (3) have engaged in the same conduct. Mitchell, 964 F.2d at 583.

In the instant case, Plaintiff asserts that he "can show that [Miles] Spears, [Art] Shumway, and other employees were similar in all *relevant* respects . . . ." (Pl.'s Mem. in Support of Pl.'s Resp. to Def.'s Mot. for Summ. J. 6. (emphasis in original).) Plaintiff argues that Miles Spears, who is Caucasian, and who at no time served in the military, admitted that he falsified documents in relation to his job at UPS. (Bobo Dep. 53:23-54:7; Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. H, Dep. of Eddie

Roach ("Roach Dep.") 88:5-90:23.)   Plaintiff asserts that
Mr. Spears was treated more favorably than Plaintiff
because Mr. Spears was demoted and not terminated after
engaging in the same conduct as Plaintiff.  (Bobo Dep.
53:23-54:7.)  Applying the principles set forth in
Mitchell, and Erecegovich, the Court is not convinced that
Mr. Spears is a similarly-situated employee.

First, it is undisputed that Plaintiff and Mr. Spears
had different jobs and worked in different facilities.
While Plaintiff was an On-Road Feeder Supervisor at the
Oakhaven Center in Memphis, Tennessee at the time he
falsified the Flenorl safety record, Mr. Spears worked as a
Center Manager at a Fort Smith, Arkansas facility.

Second, Mr. Spears and Plaintiff had different
supervisors.  (Wagner Decl. ¶¶ 8, 28.)  The record
indicates that Plaintiff reported to Norman Morton, who
reported to Bob Wagner, a Division Manager in UPS's Mid-
South District.  (Id.)  Neither Mr. Morton nor Mr. Wagner
was in Mr. Spears's chain of command, and Plaintiff
presents no evidence that either of them played a role in
the decision to demote Mr. Spears.[1]  Moreover, Mr. Spears's

---

[1] To the extent Plaintiff argues that he and Mr. Spears are similarly
situated because Bob Cowan, UPS Operations Manager, played a role in
both adverse employment decisions, the Court is not convinced.  Mr.
Roach testified, without contravention in the record, that disciplinary
decisions were "not single-person decision[s]."  (Roach 90:24-91:3.)

alleged admission was made to Eddie Roach, who had no part in the decision to terminate Plaintiff.[2]  (Roach Dep. 7:17-8:2.)

Thus, Plaintiff and Mr. Spears worked under different supervisors in different offices and performed different jobs.  These factors compel the conclusion that Plaintiff and Mr. Spears were not similarly-situated employees.

Plaintiff also contends that Art Shumway, a Feeder Supervisor, is similarly situated to Plaintiff.  However, the only argument Plaintiff makes with respect to Shumway is that he "conducted personal business on company time, in effect stealing time."  (Pl.'s Resp. to Def.'s Mot. for Summ. J. 7.)  While Mr. Shumway may have served in the same capacity as Plaintiff at UPS, Plaintiff's claim that Mr. Shumway "conducted personal business on company time" is unsubstantiated by admissible evidence.  Moreover, Shumway's alleged infraction is of a different type than that of which Plaintiff was accused.  See Johnson v. Ready Mixed Concrete Co., 424 F.3d 806, 811 (8th Cir. 2005) ("Violations of different company policies do not

_____

[2] At the time Plaintiff was terminated, Eddie Roach was a workforce planning manager with UPS in South Carolina. (Roach Dep. 7:17-8:2.) Mr. Roach testified that he played a role in the decision to demote Spears, but also testified that disciplinary decisions are typically made by consensus or majority vote among a three person group that includes Bob Cowan. (Id. 94:21-95:23.)

necessarily support an inference that employees are similarly situated, particularly where one violation is considered more serious than another.") (citations omitted).

The Court therefore finds that Plaintiff has failed to identify a similarly-situated non-protected employee who was treated more favorably than Plaintiff.  Because Plaintiff has failed to establish a prima facie case, Defendant's Motion for Summary Judgment on Plaintiff's Title VII race discrimination claim is GRANTED.

### 2. Retaliation

Title VII makes it unlawful for an employer to "discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  Unlawful employment practices under Title VII include actions taken because of race, color, religion, sex or national origin that discriminate with respect to "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2, and employment practices that are facially neutral but have a disparate impact on a racial, religious, or other group

protected under the statute, Griggs v. Duke Power Co., 401 U.S. 424 (1971).

In the absence of direct evidence of retaliation, courts analyze Title VII retaliation claims at the summary judgment stage using the McDonnell Douglas burden-shifting framework.  Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 544 (6th Cir. 2008).  Under this framework, the plaintiff has the initial burden to establish a prima facie case of retaliation by showing: (1) he engaged in a protected activity; (2) defendant knew he engaged in the protected activity; (3) defendant subsequently took an adverse action against him; and (4) there was a causal connection between the protected activity and the adverse action.  Id.

Once the plaintiff presents sufficient evidence to establish his prima facie case, the burden then shifts to the employer to "produce evidence of a legitimate, nondiscriminatory reason for the adverse employment action."  Id.  The plaintiff must then show that the defendant's proffered reason for the adverse action was a pretext for intentional retaliation.  Id.

Defendant contests Plaintiff's ability to satisfy two elements of the prima facie case.  Defendant argues that Plaintiff did not engage in a protected activity, and that

even if he did, there was no causal connection between that activity and the adverse employment action.  (Def.'s Mot. for Summ. J. 14.)

Turning first to whether Plaintiff engaged in a protected activity, the Court notes that "an employee need not file a formal EEOC complaint to engage in protected activity . . . ."  Fox v. Eagle Distrib. Co., Inc., 510 F.3d 587, 591 (6th Cir. 2007).  However, "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  Id.; Booker v. Brown & Williamson Tobacco Co., Inc., 879 F.2d 1304, 1313 (6th Cir 1989); Johnson v. Potter, No. 07-2665-STA-dkv, 2009 WL 368366, at *9 (W.D. Tenn. Feb. 12, 2009) (no protected activity where "there is no evidence in the record to reflect that [the employee] complained to [the employer] about unlawful discrimination on the basis of a protected characteristic").

It is undisputed that Plaintiff did not file a formal internal complaint alleging a violation of Title VII. Plaintiff argues, however, that he engaged in protected activity when he (1) "presented his [military] Orders in March of 2007 to Bob Wagner and Jeff Hauss, two senior

members of UPS management"; and (2) "refused to discipline Sharon Thompson on a pretext." (Pl.'s Mot. for Summ. J. 13.)

Plaintiff's first assertion is inapposite: Title VII does not protect military status as such.  See Niswander v. Cincinnati Ins. Co., 529 F.3d 714, 720 (2008).

Plaintiff also argues that he engaged in protected activity when he refused to "disqualify" Sharon Thompson, an African-American female trainee. (Bobo Decl. ¶ 5.) Plaintiff's declaration states in relevant part:

> I was asked to train an African American female named Sharon Thompson.  I was told by Norman Morton 'you will disqualify her no matter what she does.'  I was troubled by this demand and afraid to carry it out.  I did not disqualify her.  I was often harassed for not following the plan to discriminate against this employee.  My gut feeling was right.  She has an EEOC complaint against the company.

(Id.)

Although Plaintiff states that he was unwilling to "disqualify" an African-American female, there is no indication that his unwillingness to do so was related to perceived discrimination based on her protected characteristics under Title VII.  That Plaintiff described Ms. Thompson as an "African-American female" is not determinative, since Plaintiff alleges no facts to indicate that the alleged discrimination occurred because of her

race and/or gender.  "[A] vague charge of discrimination .
. . . is insufficient to constitute opposition to an unlawful
employment practice. . . .  Otherwise, every adverse
employment decision by an employer would be subject to
challenge under either state or federal civil rights
legislation simply by inserting a charge of
discrimination."  Booker, 879 F.2d at 1313.

For these reasons, the Court finds that Plaintiff has
failed to create an inference "[sufficient] to constitute
opposition to an unlawful employment practice."  Id.
Because Plaintiff has failed to show that he engaged in a
protected activity, it is unnecessary to consider the
causation requirement.  Therefore, since Plaintiff has
failed to establish a prima facie case of retaliation, the
Court GRANTS Defendant's Motion for Summary Judgment as to
Plaintiff's Title VII retaliation claims.

**B. THRA**

Tennessee state courts have "looked to federal case
law applying the provisions of the federal anti-
discrimination statutes as the baseline for interpreting
and applying [THRA]."  Graves v. Circuit City Stores, Inc.,
No. 03A01-9501-CH-00012, 1995 WL 371659, at *2 (Tenn Ct.
App. June 21, 1995)(citing Brenner v. Textron
Aerostructures, 874 S.W.2d 579 (Tenn. Ct. App. 1993); Bruce

v. Western Auto Supply Co., 669 S.W.2d 95, 97 (Tenn. Ct.
App. 1984)).  Therefore, for the same reasons that the
Court grants summary judgment on Plaintiffs' Title VII
claims of racial discrimination, the Court GRANTS
Defendant's Motion for Summary Judgment on Plaintiffs' THRA
claims of racial discrimination.

**C. USERRA Claims**

**1. Discrimination**

USERRA prohibits employment discrimination on the
basis of military service.  Hance v. Norfolk S. Ry. Co.,
571 F.3d 511, 517 (6th Cir. 2009).  Under USERRA, a person
may not be denied "retention in employment" due to
voluntary or obligatory military service.  38 U.S.C.
§4311(a).  A USERRA plaintiff must demonstrate that his
military service was a "motivating factor" in the adverse
employment decision.  Hance, 571 F.3d 511, 518 (6th Cir.
2009).  A USERRA claimant is not required to show that his
military service was the "sole cause" of the adverse
action, only that it was "one of the factors that a
truthful employer would list if asked for the reasons for
its decision."  Coffman v. Chugach Support Services, 411
F.3d 1231, 1238-39 (11th Cir. 2005).

Courts look to a number of factors in determining whether military service was a motivating factor in the adverse employment action, among them:

> [1] proximity in time between the military activity and the adverse employment action, [2] inconsistencies between the reason proffered by the employer and other actions of the employer, [3] an employer's expressed hostility towards employees protected under the statute together with knowledge of the employee's military activity, and [4] disparate treatment of protected employees compared to employees not protected under the statute, but who have similar work records and offenses.

Hance, 571 F.3d at 518 (quoting Sheehan v. Dep't of Navy, 240 F.3d 1009, 1013 (Fed. Cir. 2001)).

If an employee can establish an inference of discriminatory motive, the burden "shifts to the employer to prove the affirmative defense that legitimate reasons, standing alone, would have induced the employer to take the same adverse action." Id. (quoting Sheehan, 240 F.3d at 1013). In other words, even if a motivating factor exists, summary judgment is appropriate if the defendant can show that it would have made the same decision based solely on non-USERRA-protected grounds.

Plaintiff points to two possible adverse employment actions under USERRA's anti-discrimination prong: his

termination, and what he alleges was an improperly-increased workload in January 2006.[3]

### a. Plaintiff's Termination

Plaintiff asserts that he has direct evidence of a USERRA violation.  Plaintiff points to a memorandum drafted by Mr. Morton regarding Plaintiff's termination.  Plaintiff asserts that, as reflected in paragraph three of the memorandum, Mr. Morton "discouraged [Plaintiff] from serving his country and blamed his military leave for Oakhaven's failure to complete the safety rides in a timely manner."  (Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. 15.)

Paragraph three of the memorandum states in relevant part as follows:

> 3. Was Walleon Bobo unfairly treated because of his military status, and were comments made by me that he should choose either the military or UPS?
>
> The only recollection I have of discussing Walleon's military duty was 1) When Walleon was called to serve as a reservist more than 2 weeks per year, I questioned whether this additional time was per his orders, or was it voluntary.  The reason I asked [sic], because I was under the impression that he would only be asked to serve two weeks per year, and that any additional time would be served on weekends.  I did not want Walleon

---

[3] The investigation itself into whether Plaintiff falsified safety records was not an adverse employment action.  See Harrison v. City of Akron, 43 F. App'x 903, 906 (6th Cir. 2002) (citing Benningfield v. City of Houston, 157 F.3d 369, 375 (5th Cir 1998)).

> volunteering for additional military duty
> when he was needed at UPS. Walleon supplied
> me with information that answered my
> questions, and that in fact he could be
> called much more than two weeks per year . .
> . . He assured me that this was not
> voluntary on his part . . . ."

(Cowen Dep., Ex. 1, Morton Memo. ¶ 3.)

Had this statement been made by someone who was responsible for the decision to fire Plaintiff, the statement might well establish Plaintiff's prima facie case that his military service was a motivating factor in that decision. See, e.g., Grosjean v. Firstenergy, 481 F. Supp. 2d 878, 883 (N.D. Ohio 2007). But Plaintiff has put forth no admissible evidence to tie Morton to the decision to terminate Plaintiff's employment.

In cases where a mid-level manager, like Morton, poisoned the minds of the ultimate decision-makers against the affected employee, there was evidence to tie the mid-level manager's discrimination to the decision-making process. See, e.g., Kientzy v. McDonnell Douglas Corp., 990 F.2d 1051, 1054-60 (6th Cir. 1993); Wilson v. Stroh Cos., Inc., 952 F.2d 942, 946 (6th Cir. 1992). Plaintiff has made no such showing. Without some admissible evidence to support an inference tying the Morton statement to Plaintiff's termination, the Morton statement cannot support Plaintiff's prima facie burden under USERRA.

**b. Plaintiff's Increased Work Load in January 2006**

Plaintiff points to another putative adverse employment action on the basis of his military status: he claims that in January 2006 he was forced to supervise twice as many drivers as were his non-military co-workers. (Bobo Aff. ¶ 6.) (Plaintiff does not suggest, however, that there was a corresponding increase in his work hours.) Defendant argues that the apparent disparity in responsibilities is the result of a typographical error, and that Plaintiff actually had a normal work load that month. (Def.'s Mot. for Summ. J. 13.)

Considering the evidence in the light most favorable to Plaintiff, the Court will accept Plaintiff's assertion that he had a higher-than-average work load in January 2006.[4] Also, there is some evidence to tie Morton to Plaintiff's altered duties, which could support an inference that Plaintiff's military status was a motivating factor in the decision to increase Plaintiff's work load.

Even so, Defendant is still entitled to judgment as a matter of law: the change in Plaintiff's work load was not an adverse employment action. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with

---

[4] Plaintiff has not suggested that his work *hours* were increased.

significantly different responsibilities, or a decision causing a significant change in benefits." White v. Baxter Healthcare Corp., 533 F.3d 381, 402 (6th Cir. 2008) (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998)). "A change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities . . . ." Broska v. Henderson, 70 F. App'x 262, 267 (6th Cir. 2003) (quoting Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 886 (6th Cir. 1996) (quotation marks omitted)). "Job changes that do not change one's salary, benefits, title, or work hours usually do not constitute adverse employment actions, even if one's job becomes significantly more difficult." Broska, 70 F. App'x at 267 (citations omitted).

Plaintiff has put forth no evidence to suggest that his "salary, benefits, title, or work hours" were affected. See id. Plaintiff's increased work load during January 2006 may well have been unpleasant, but under Sixth Circuit precedent, "inconvenience" and increased "difficult[y]," without more, do not establish an adverse employment action. See id.

Because Plaintiff has failed to put forth evidence to tie Morton's putatively discriminatory statements to Plaintiff's termination, and because Plaintiff's increased

22

work load in January 2006 was not an adverse employment action, the Court GRANTS Defendant's Motion for Summary Judgment as to Plaintiff's USERRA discrimination claims.

### 2. Retaliation

In addition to providing protections for discrimination based on military service, USERRA also prohibits employers from "tak[ing] any adverse employment action against any person because such person has taken an action to enforce a protection afforded any person under [USERRA], . . . or has exercised a right provided for in [USERRA]." 38 U.S.C.A. §4311(b). In this case, Plaintiff alleges that UPS retaliated against him – by terminating him – after he submitted his Orders for military duty in March 2007.[5] To succeed on a USERRA retaliation claim, Plaintiff must demonstrate that submitting his Orders in March 2007 was a motivating factor in Defendant's decision to terminate him. Id. at § 4311(c)(2); see Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 309 (4th Cir. 2006). If Plaintiff can show that submitting his Orders was a motivating factor in UPS's decision to terminate him, the burden shifts to UPS to show that it would have made the same decision even if Plaintiff had not submitted the Orders. See id.

---

[5] As noted above, the investigation itself was not an adverse employment action. See supra note 3.

As with his USERRA discrimination claims, Plaintiff fails to put forth admissible evidence to support his USERRA retaliation claim.  Since Plaintiff has not tied Morton to the termination proceedings, Plaintiff's only evidence that could support a finding of retaliation is the temporal proximity between when Plaintiff submitted his Orders and when he was terminated.  (See Pl.'s Resp. to Def.'s Mot. for Summ. J. 13.)  Plaintiff submitted his Orders in March 2007, and he was terminated on May 22, 2007.  (Wagner Dep. ¶ 27.)

When an adverse employment action occurs very close in time after the employer learns of a protected activity, temporal proximity alone may be enough to establish the causation element of the prima facie case.  Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2007). "But where some time elapses between when the employer learns of the protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."  Id.

The two-to-three-month period between when Plaintiff submitted his Orders in March 2007 and when he was terminated on May 22, 2007 is insufficient to establish temporal proximity in this case.  See Arendale v. City of

Memphis, 519 F.3d 587, 606-07 (6th Cir. 2008) (two months between EEOC complaint and suspension insufficient, standing alone, to support causal connection); Cooper v. City of North Olmsted, 795 F.2d 1265, 1272 (6th Cir. 1986). Accordingly, the Court GRANTS Defendant's Motion for Summary Judgment on Plaintiff's USERRA retaliation claim.

**IV. CONCLUSION**

Because Plaintiff has failed to establish a prima facie case on any of his claims, the Court GRANTS Defendant's Motion for Summary Judgment as to all of Plaintiff's claims. Accordingly, this case is DISMISSED with prejudice in its entirety. Further, the Court DENIES as moot the Parties' pending motions in limine.

SO ORDERED this 2nd day of September, 2009.


/s/ Jon P. McCalla_____

JON P. MCCALLA
CHIEF U.S. DISTRICT JUDGE